818 P.2d 174

**COX ARIZONA PUBLICATIONS, INC.,
an Arizona corporation, dba the Trib-
une, and Phoenix Newspapers, Inc., an
Arizona corporation dba the Arizona
Republic, Plaintiffs–Appellees,**

v.

**Thomas E. COLLINS, State of Arizona,
Maricopa County Attorney,
Defendant–Appellant.**

No. 1 CA–CV 89–018.

Court of Appeals of Arizona,
Division 1, Department E.

May 7, 1991.

Review Granted Oct. 25, 1991.

Gust, Rosenfeld & Henderson by Ter-rance C. Mead, Colleen M. Parker, Patricia Sallen, Phoenix, for plaintiffs-appellees.

Grant Woods, Atty. Gen. by Toni McClo-ry, Asst. Atty. Gen., Phoenix, for amici curiae.

Richard M. Romley, Maricopa County Atty. by H. Allen Gerhardt, Deputy County Atty., Phoenix, for defendant-appellant.

* A Judge of the Pima County Superior Court authorized and assigned to sit as a Judge on the Court of Appeals, Division Two, pursuant to

Arizona Supreme Court Order filed July 25, 1990.

## OPINION

EUBANK, Presiding Judge.

During an active ongoing criminal prosecution, does a newspaper reporter have the right, pursuant to A.R.S. §§ 39–121 to – 121.03 of the Public Records Act, to inspect and copy police investigation reports that are in the possession of the prosecuting attorney? We answer this question in the negative and reverse the trial court's judgment awarding appellees attorneys' fees and costs pursuant to A.R.S. § 39–121.-02(B).

## FACTUAL AND PROCEDURAL BACKGROUND

After a Phoenix police investigation into alleged drug use by members of the Phoenix Suns and others became public information, two Phoenix newspapers, Cox Arizona Publications, Inc. and Phoenix Newspapers, Inc. (Reporters), requested access to the department's investigative files and reports. Because the case, involving multiple defendants, was before a grand jury and subject to a continuing investigation, the files were in the possession of then County Attorney Thomas E. Collins (Collins), and he refused to provide access to this information. On May 20, 1987, the reporters filed a special action complaint against Collins and City of Phoenix Police Chief Ruben B. Ortega (Ortega) alleging a violation of the Public Records Act as follows:

6. Sometime prior to April 16, 1987, Phoenix police officers under the direction of Ruben Ortega conducted investigations of alleged drug abuse and other criminal actions by past and current members of the Phoenix Suns basketball team and parties associated with those individuals. Numerous offense reports were prepared detailing the conduct of that investigation and evidencing the efforts, time and costs expended by government officials conducting the investigation. Those offense reports and supporting documents have been compiled and are known generally as the "Phoenix Police Department report on the Phoenix Suns investigation."

7. All activities of the investigators were supported by public funds.

8. Ruben Ortega is required by law, specifically A.R.S. § 39–121.01.B, to "maintain all records reasonably necessary or appropriate to maintain an accurate knowledge of their official activities and of any of their activities which are supported by funds from the state or any political subdivision thereof." It was Ruben Ortega's further duty, pursuant to A.R.S. § 39–121.01.C, to secure, protect and preserve those public records from loss and he is responsible for the preservation, maintenance and care of his records.

9. Defendant Ortega has alleged, and Defendant Collins has stated, that Ortega caused his records of the above-mentioned investigation to be transferred to the custody of Defendant Collins, and Collins refuses to return the records to Ortega.

10. On April 17, 1987, a reporter for The Tribune formally demanded from Defendant Ortega access to the Phoenix Police Department report on the Phoenix Suns' investigation pursuant to A.R.S. § 39–121.01.D. The request was denied one week later.

11. A reporter for The Tribune, on May 14 and May 18, 1987, and reporters for The Arizona Republic, on May 18, 1987, demanded of Defendant Collins access to the Phoenix Police Department report on the Phoenix Suns' investigation pursuant to A.R.S. § 39–121.01.D.... Defendant Collins denied the request by letters dated May 15 and May 19, 1987.

12. The term of the grand jury investigating the allegations contained in the reports requested expired May 14, 1987; indictments have been returned against the individual real parties in interest to this action; and the investigation by the Phoenix Police Department has ended.

13. Defendant Ortega's transfer of the records to defendant Collins constitutes a failure to preserve, maintain and care for his public records and to secure, protect and preserve his records from loss and constitutes a violation of A.R.S. § 39–121.01.C, and a failure to perform a duty

required by law as to which he has no discretion.

14. Defendants' refusals to allow examination or to provide copies of the documents, as requested, constitute violations of A.R.S. § 39–121.01.D and constitute: a failure to exercise discretion which they have a duty to exercise; or a failure to perform a duty required by law as to which they have no discretion; or a determination that is arbitrary and capricious or an abuse of discretion.

The supporting documents attached to the petition included a Cox Arizona reporter's May 14, 1987 letter to Collins, which requested access for examining and photocopying to the Phoenix Police Departmental Report on the Phoenix Suns investigation. The letter demanded a response by the close of business the following day. On May 18, 1987, three Phoenix Newspapers, Inc. reporters filed a similar letter requesting "access to inspect and photocopy the Phoenix Police Department report detailing the investigation into allegations of illegal drug use by members of the Phoenix Suns professional basketball team and others." This letter threatened litigation if compliance with the request was not forthcoming.

On May 15, 1987, Collins responded by letter to the Cox reporter's May 14, 1987, request, and he later sent the same reply to the Phoenix Newspaper reporters' May 18, 1987, request:

> In response to your letter of May 14, 1987, requesting that we furnish you with copies of the Phoenix Police Departmental Reports relating to the investigation of some Phoenix Suns players and others, I am writing this to request that you withdraw your letter for the reasons set forth below. These reasons do not address any legal arguments which apply but are an appeal to your community responsibility.

> As an elected official responsible to all the population of Maricopa County and not just to the readers of the Mesa Tribune, I do not believe it is in the public interest for anyone to provide copies of police reports relating to this case. Public disclosure at this time would hamper our ability to complete the ongoing investigation and prosecution of those people that we believe have committed criminal offenses. Also, public disclosure at this time, of these reports could possibly lead to a denial of the rights of those charged to a fair trial.

> The public demands and rightfully expects that in my position as prosecutor, that I pursue criminal offenders to the utmost of my ability. I am fully aware that there is high public interest not only in this particular case but also in doing something about the drug problem throughout our community. The public expects me to take action and disclosure of these reports would hurt my ability to take the effective action that the public demands.

> Already more material has been disclosed than should have been in this case and there has been rampant speculation in the media that has hurt innocent and non-charged people. Disclosure of these reports at this time would have a significant negative impact on any parties who are considering cooperating with authorities in the future and who may be reluctant to do so because of disclosure of their identities in the police reports.

> Any motion for change of venue because the defendants cannot receive a fair trial in Maricopa County will cause considerable attorney work in answering the motion. In the event a change of venue was granted, it would unnecessarily cost the taxpayers many thousands of dollars to hold these trials in another county.

> I am asking for you to withdraw your request also because the cost of litigation of this issue would come out of the pockets of the taxpayers of Maricopa County. If we have to go to Court to resolve this issue, whatever the outcome, it will be financially costly to the public.

> If there is a requirement to edit and disclose these reports, no agency involved has the available manpower to divert to editing hundreds of pages of police reports. No one is able to comply with your deadline of the end of the

business day today. Diversion of police and prosecution manpower to this task would be a major impediment to fulfilling our duty to pursue the guilty parties.

I feel that as the prosecutor, I have an ethical obligation not to discuss this case beyond the American Bar Association guidelines and disclosure of these reports would subject me to ethical complaints by the State Bar.

Any "public right to know" or your interest in the commercial purpose which has not already been more than fulfilled by the disclosures which have already taken place will certainly be complied with through the normal motion and public trial process which occurs in every case. Whatever "right" you believe you may have regarding this material, there is a corresponding responsibility as a member of this community to exercise that right in the public interest. Therefore I would respectfully ask that you reconsider and withdraw your request for these police reports.

After receiving Collins' reply, the Reporters filed their special action complaint. On May 21, 1987, Judge John H. Seidel set a May 27, 1987, hearing to schedule briefing and other matters. Meanwhile, the real parties in interest, criminal defendants in the related cases, appeared and, with two exceptions requested that their rights to a fair trial and due process of law under the Arizona and United States Constitutions be protected by denying disclosure until the conclusion of their trials. On May 26, 1987, in the related cases, Judge Michael D. Ryan considered a request for a "Gag Order" by the real parties in interest. Judge Ryan granted the motion and issued the following order:

\* \* \* \* \* \*

The Court has considered the motion, the comments of various counsel and the file in this matter. The Court also takes notice that the Presiding Judge has appointed the Attorney General's Office to investigate the allegedly unlawful disclosure to the media of the entire Grand Jury Transcripts in these matters. Additionally, attached to [a] Notice of Objection to Cameras in the Courtroom in CR 87–03413 filed on May 12, 1987, are copies of numerous newspaper articles that contain numerous comments by various parties on the nature of the matters before the Court. Also, excerpts of the Grand Jury Transcripts have been published at length in all media.

*Under all of the circumstances before the Court, it is obvious that there is a clear and present danger that the pervasive media coverage already surrounding these matters has threatened all Defendants' rights to a fair trial.* Any future media coverage that would include extra-judicial comments on the merits of the issues before the Court would clearly present a serious threat, if not fatal blow, to the rights of all parties to receive a fair hearing and trial on these matters.

THEREFORE, IT IS ORDERED granting the Motion for a Gag Order.

Accordingly, the parties shall not, directly or indirectly, release to any news media information or opinion concerning the trials or issues likely to be heard by the Court. Specifically there shall be no extrajudicial (public) statements or releases concerning the merits of the charges, motions, evidence or arguments *to be adduced by either side*, or trial tactics or strategy.

This Order shall apply to all parties, their counsel and investigators and to all law enforcement agencies involved in the matters before the Court. Counsel are ordered to notify all potential witnesses of the Court's Order.

Violation of this Order could result in institution of contempt proceedings.

\* \* \* \* \* \*

This Order will be reviewed every 90 days during the pendency of these matters.

(Emphasis added.)

Based on Judge Ryan's order, Ortega and Collins moved to dismiss the special action complaint before Judge Seidel. Collins' motion was based on two arguments: first, Judge Ryan's "Gag Order" in the related cases specifically precluded him

from complying with the reporters' May 14, 1987, request; and second, Rule 42, Rules of the Supreme Court, ER 3.6(a) and (b)(1) through (5) restricting trial publicity, and ER 3.8(e) involving a prosecutor's special responsibilities to ensure defendants a fair trial, precluded him from granting the reporters' requests.

At the June 10, 1987, hearing on the motions to dismiss, Judge Seidel stayed further consideration of the motions because counsel had filed a motion before Judge Ryan, in the related cases, seeking to modify the "Gag Order".

Judge Seidel stated, in part:

\* \* \* \* \* \*

[T]he Court is of the opinion that Judge Ryan's Order precludes those to whom it is directed, including defendants Ortega and Collins, from disclosing the police reports which are the subject of this case. If this division were to grant the relief prayed for in the complaint, doing so, would amount to a reversal of Judge Ryan's Order, or would require the defendants to violate Judge Ryan's order. For these reasons, the Court feels that defendants Ortega and Collins' Motions to Dismiss are well taken.

At oral argument the Court was informed that a motion is pending before Judge Ryan seeking a modification of his Order of May 26, 1987. Conceivably, Judge Ryan could modify or clarify his Order so as to eliminate the concerns expressed by this division above. If this case was dismissed at this time, and if Judge Ryan did modify or clarify his Order, plaintiffs would conceivably have to refile this action in an effort to seek the relief prayed for in the complaint and the Court is of the opinion that such would amount to a needless waste of time and expense on the part of all concerned. For the foregoing reasons,

IT IS ORDERED that further proceedings in this case shall be stayed until such time as Judge Ryan's Order is modified or clarified as outlined above at which time counsel may file appropriate motions to lift the stay order.

On June 24, 1987, Judge Ryan, in the related cases, declined to modify the "Gag Order", but reviewed the factual basis requiring the order:

\* \* \* \* \* \*

These cases have been subject to extensive publicity in all media.... [I]n CR 87–03415, ... a Motion filed on June 10, 1987, set forth an exhaustive review of the media coverage regarding these cases.

In the 49–page Motion and the 113 pages of Exhibits attached to it are summaries of television accounts and copies of numerous newspaper articles which discuss these cases. Media coverage began on April 8, 1987, a week before any indictments were returned by the Grand Jury. Daily accounts naming who was appearing before the Grand Jury appeared in all media.

The news accounts reached a crescendo on the weekend of April 17, 1987, when the indictments were returned. With the return of the indictments came a series of dueling press conferences started by the Phoenix Police Department and the County Attorney's Office.

Thereafter, numerous newspaper articles, television accounts, and radio broadcasts published various statements of witnesses, defendants, attorneys, spokespersons, and others concerning the merits of the allegations. On Sunday, May 17, 1987, the *Arizona Republic* published the results of a statewide poll in an article that had a headline stating, "425 favor jail terms if Suns guilty." The article quoted Sgt. Brad Thiss of the Phoenix Police Department as stating "The way we read public opinion at this point is that people are getting tired of drugs from elementary schools to the workplace, *from professional players* to attorneys." (Emphasis supplied). Furthermore, the article said the poll found that 96% of the people in Arizona are aware of the indictments.

Additionally, as noted in the Court's Original Order, large excerpts of the Grand Jury proceedings have been pub-

lished in all media. The media [coverage] has not abated.

From the record before this Court, there is a clear and present danger that a fair trial cannot be had by any of the Defendants presently before the Court. The Court both before and now has considered and evaluated the press' First Amendment rights against the parties Sixth Amendment rights to a fair trial.

In *KPNX Broadcasting, Co., supra,* [139 Ariz. 246, 678 P.2d 431 (1984)], it was held that the media's right of access to criminal trials does not extend to interviewing trial participants. This Court has not limited the Media's access to any of the scheduled proceedings. The Order issued on May 26, 1987, means exactly what it says—it prohibits extrajudicial comments on the merits of the cases and issues before the Court. The Order is believed necessary to ensure fair trials in these matters.

This is considered to be the least restrictive course of conduct in this situation. It is believed to be necessary in light of the extensive media coverage of these cases. *See Sheppard v. Maxwell,* 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] (1966). Further, it does not restrict the press in any way on reporting that occurs in [open] Court as to both pretrial and trial proceedings.

The Court has also considered alternatives such as continuances or change of venue. Continuances as of this date have not resulted in any reduction of media interest in this case. Change of venue would be pointless in light of the extensive media coverage which has occurred both statewide and nationally. Thus, at a minimum, a prohibition against public statements by the listed individuals on the merits of the matters before Court is necessary to ensure fair trial.

Finally, as to Intervenors' request that the Order here be clarified with respect to the pending civil action in CV 87–13816 [this appeal], in which Intervenors [Reporters] as Plaintiffs in that matter have requested inspection of all the police reports in these matters, the request is granted.

*As stated in the original Order, the Order prohibits extrajudicial (public) statements on the merits of the matters before the Court. Any act taken as a result of a Court Order in CV 87–13816 would not be an extrajudicial statement. Therefore, Court Ordered disclosure of police reports or portions of reports relating to these cases would not violate this Order. The Defendants in CV 87–13816, Collins and Ortega, cannot use this Order in these cases as a shield to hide behind in that case. The issues there must be litigated in compliance with Judge Seidel's Orders.*

This clarification of the Court's Order is not intended as a comment or opinion on any of the proceedings before Judge Seidel in CV 87–13816.

Accordingly, in light of all of the above, except as otherwise clarified, Intervenors' Motion for Reconsideration of the Order prohibiting extrajudicial statements issued on May 26, 1987, is Denied.

(Emphasis added.)

At this point, the Reporters requested a change of judge, which was granted. Judge Jeffrey S. Cates replaced Judge Seidel. Following several hearings, Judge Cates, on October 6, 1987, ordered disclosure of the investigative police reports. He stated the basis for his order as follows:

Based on Arizona's public record statute, public records are presumed open for inspection. *Carlson v. Pima County,* 141 Ariz. 487, 491, 687 P.2d 1242, 1246 (1984). Law enforcement investigative reports and materials are not exempted by statute from disclosure.

This right to inspection is not without qualifications. The public's right to access is balanced against concern about disclosure detrimental to the best interests of the State, and the protection of confidentiality of information and privacy rights. *Carlson,* 141 Ariz. at 490 [687 P.2d at 1245]. The burden to show probable specific harm from disclosure rests with the party seeking nondisclosure.

*Mitchell v. Superior Court,* 142 Ariz. 332, 335, 690 P.2d 51, 54 (1984).

Collins filed a special action in this court on October 19, 1987 (1 CA–SA 87–1283), and the next day we ordered a stay of all superior court proceedings. Following oral argument on November 17, 1987, we accepted jurisdiction of the special action petition. On December 22, 1987, Collins filed a "Notice of Status of Related Criminal Proceedings," which, in effect, advised us that the criminal proceedings were completed. Because the special action issue was then moot, we vacated our November 18, 1987, order, declined jurisdiction, vacated our stay and ordered the matter returned to Judge Cates' jurisdiction. Following an informal conference on January 15, 1988, Judge Cates authorized Collins to release a redacted copy of the investigative police reports to the reporters. Later, he denied the reporters' request for any part of the Grand Jury proceedings transcripts, reserved the issue of the reporters' request for attorneys' fees and costs and sealed the record pending a possible appeal. Following briefing and argument, on May 31, 1988, Judge Cates considered the reporters' request for fees under A.R.S. § 39–121.-02(B).[1] He found no evidence in the record of a conspiracy between Collins and Ortega, and thus denied any fee award against Ortega. Judge Cates then found against Collins as follows:

> As this case evolved, the denial of the records was not wrongful after the dismissal of the Court of Appeals Special Action. Thereafter, redacted records were submitted to the Court for an in-camera inspection. Until that time a redacted report was not offered to the Court for an in-camera inspection, apparently because of the pendency of the criminal proceeding. The question is whether the refusal to offer a redacted file to the Court was not only wrongful,

but in bad faith or arbitrary or capricious.

> This Court is now and always has been of the opinion that the failure to submit a redacted report was wrongful. Although wrongful, the failure was not in bad faith. However, this Court is of the opinion that the failure to produce a redacted record, notwithstanding the justification cited by defendant Collins, was arbitrary and capricious.

> Had there been an earlier in-camera review of the record, it is likely that this extensive litigation would have been avoided from that point forward.

Based on these findings, on September 19, 1988, Judge Cates awarded the reporters $30,000.00 in attorneys' fees and costs against Collins pursuant to A.R.S. § 39–121.02(B). This was later reduced to judgment, and Collins appealed from the November 1, 1988, judgment.

## ISSUE

Collins raises one issue on appeal: Did the trial court err in awarding attorneys' fees and costs against him pursuant to A.R.S. § 39–121.02(B)?

## STANDARD OF REVIEW

■ The trial judge is authorized to award costs and reasonable attorneys' fees to the reporters if the court finds that the custodian of the records acted in bad faith or in an arbitrary or capricious manner. A.R.S. § 39–121.02(B). The standard for reviewing a discretionary award of reasonable attorneys' fees is whether the trial judge abused his discretion. *Associated Indemnity Corp. v. Warner,* 143 Ariz. 567, 570–71, 694 P.2d 1181, 1184–85 (1985). Because the exercise of the court's discretion here is based on a question of law, we must examine the scope of the Public Records Act in relation to the facts presented by this appeal.

---

1. A.R.S. § 39–121.02(B) provides:
    If the court determines that a person was wrongfully denied access to or the right to copy a public record and if the court finds that the custodian of such public record acted in bad faith, or in an arbitrary or capricious manner, the superior court may award to the petitioner legal costs, including reasonable attorney fees, as determined by the court.

## DISCUSSION

The reporters contend that Arizona's Public Records Act entitles them to inspect and copy police investigative reports relating to the Phoenix Suns police investigation under the facts alleged in their complaint and that Collins arbitrarily and capriciously ignored both the law and facts in taking possession of the records and denying them their right to inspect them. This contention is consistent with the portions of the special action complaint set out above.

In support of their contention, the reporters primarily rely on *Carlson v. Pima County*, 141 Ariz. 487, 687 P.2d 1242 (1984). *Carlson* involved an inmate in the Pima County Jail. While in jail, he was implicated in an alleged sexual assault on another inmate. An officer recorded the incident on an "offense report" that was viewed by a reporter and published. Carlson then sued Pima County and the sheriff for defamation. The trial court granted directed verdicts in favor of both the county and sheriff, and Carlson appealed. The opinion of Division Two of this court, *Carlson v. Pima County*, 141 Ariz. 517, 687 P.2d 1272 (App.1983), affirming the trial court, was approved as supplemented by the supreme court. 141 Ariz. at 492, 687 P.2d at 1247. The supreme court noted that A.R.S. § 39–121.01(B) required the sheriff to make and maintain the offense report; thus, the report was a public record. This, in turn, raised the issue addressed in *Mathews v. Pyle*, 75 Ariz. 76, 251 P.2d 893 (1952): whether countervailing interests overrode the policy favoring disclosure. The supreme court held that the present statutory scheme was not intended to overrule the balancing scheme adopted in *Mathews*, but that the combined effect of A.R.S. §§ 39–121, 39–121.01, 39–121.02 and 39–122 evidenced a clear legislative policy favoring disclosure. 141 Ariz. at 490, 687 P.2d at 1245. The court went on to state:

> In light of our statutory policy favoring disclosure, we think that the best procedure is that all records required to be kept under A.R.S. § 39–121.01(B), are presumed open to the public for inspection as public records. [Although] access and disclosure is the strong policy of the law, the law also recognizes that an unlimited right of inspection might lead to substantial and irreparable private or public harm; thus, where the countervailing interests of confidentiality, privacy or the best interests of the state should be appropriately invoked to prevent inspection, we hold that the officer or custodian may refuse inspection. *Mathews v. Pyle, supra.* Such discretionary refusal is subject to judicial scrutiny.

*Id.* at 491, 687 P.2d at 1246.

The court went on to state that "[a]bsent a showing of malice, the release and publication of that report was protected against a defamation action by a qualified privilege." *Id.* This "qualified privilege" holding modifies Division Two's opinion, which spoke in terms of privilege, rather than qualified privilege. The supreme court stated:

> We hold that the Sheriff was protected by a qualified privilege here and that since there was no showing of ill-will or malice in the release of this report and the action was one for defamation only, the qualified privilege was properly invoked.

*Id.* at 492, 687 P.2d at 1247.

■ Based on *Carlson*, the reporters argue that Collins is an "officer" as defined by A.R.S. § 39–121.01(A)(1), of a "public body," as defined by A.R.S. § 39–121.01(A)(2), required to "maintain all records reasonably necessary or appropriate to maintain an accurate knowledge of their official activities and any of their activities which are supported by funds from the state or any political subdivision thereof." A.R.S. § 39–121.01(B). Therefore, they argue, the police reports are public records which were subject to their inspection when demanded, pursuant to A.R.S. § 39–121.

Collins does not dispute that he is an "officer" of a "public body" subject to A.R.S. §§ 39–121 to –121.03. His opening brief concludes by summarizing his argument that the police reports were properly denied the reporters:

Substantial justification existed for the actions of Appellant [Collins] in the present case. Considerations of due process of law to protect the rights of criminal defendants, protection of an ongoing criminal investigation, ethical constraints and the strong privacy interests present here, among other factors far outweighed any statutory right of access to a police report in this case.

These are substantially the same arguments Collins raised in his May 15 and May 18, 1987, letters to the reporters and in his motion to dismiss, i.e., that he was precluded from complying with the reporters' requests because of the "Gag Order", the Rules of Professional Ethics, ER 3.6 and ER 3.8, and his duty to protect the defendants' rights to a fair trial.

We permitted the Arizona Attorney General and the remaining county attorneys to file an *amici curiae* brief. In their brief they frame the issue as "whether the media has the right to inspect criminal investigative files *before* indicted criminal defendants have been brought to trial and *before* the prosecution and grand jury have completed the investigation in the case." They answer in the negative and argue that no authority exists in support of such a right. They point out that A.R.S. § 13–2812 declares it a criminal act to disclose any matter attending a grand jury proceeding, that Judge Cates' ruling, in effect, abrogates Supreme Court Rule 42, ER 3.6, which governs a prosecutor's pretrial disclosure, that Rule 15.4(d), Arizona Rules of Criminal Procedure, expressly directs that such investigations remain confidential, and that the balancing scheme approved in *Mathews* and *Carlson* should weigh in favor of nondisclosure because of the needs of law enforcement personnel to do their work, the need to protect the defendants' fair trial rights, and the need to protect the defendants' privacy interests.

We agree with Collins and the *Amici* that disclosure of the police reports, under the circumstances set out in the petition for special action, would have been improper.

We are aided in our analysis of this issue by a recent Arizona Supreme Court opinion, *Arizona Board of Regents v. Phoenix Newspapers, Inc.*, 167 Ariz. 254, 806 P.2d 348 (1991). *Phoenix Newspapers* involved the search for a new president of Arizona State University. The search committee decided that confidentiality was critical in attracting and recruiting highly qualified prospects from other universities. The reporters, as here, demanded access to the lists of prospects pursuant to the public records law, which was denied. After numerous meetings with the reporters, the Board of Regents filed a declaratory judgment action against the newspapers seeking a determination that it had properly exercised its discretion under the public records law by not releasing the lists. The newspapers counterclaimed and amended their pleadings to allege that the Board had violated the public records law by withholding the entire group of 256 prospect resumes. The supreme court rejected this contention stating:

Arizona's public records statute reads: Public records and other matters in the office of any officer at all times during office hours shall be open to inspection by any person.

A.R.S. § 39–121. This statute was adopted in 1901 and is taken from the California provision, Chapter 610, Cal. Sess.L. 1874, § 27. Although this statute has been interpreted to favor disclosure, this policy is not absolute. As we have noted:

[Although] access and disclosure is the strong policy of the law, the law also recognizes that an unlimited right of inspection might lead to substantial and irreparable private or public harm; thus, where the countervailing interests of confidentiality, privacy or the best interests of the state should be appropriately invoked to prevent inspection, we hold that the officer or custodian may refuse inspection. Such discretionary refusal is subject to judicial scrutiny.

*Carlson v. Pima County*, 141 Ariz. 487, 491, 687 P.2d 1242, 1246 (1984) (citation omitted). We believe that the Board had the discretion to balance the countervail-

ing interests in this case. *Id.; see also Mathews v. Pyle,* 75 Ariz. 76, 251 P.2d 893 (1952). *When the release of information would have an important and harmful effect on the duties of the officials or agency in question, there is discretion not to release the requested documents. Church of Scientology v. City of Phoenix,* 122 Ariz. 338, 594 P.2d 1034 (Ct.App.1979).

*Id.* 167 Ariz. at 257–58, 806 P.2d at 351–52 (emphasis added).

The importance of *Board of Regents* is in its reaffirmance of our understanding of the law, which has been developed through the supreme court opinions in *Mathews* and *Carlson,* in which the court held that an officer may refuse inspection where countervailing interests of confidentiality, privacy or the best interests of the state should be appropriately invoked. Here we are of the opinion that such state interests weigh in favor of Collins' nondisclosure.

We begin by examining a prosecutor's duty in the criminal justice system. We have said that the prosecutor "represents the sovereign whose obligation is to govern impartially and whose chief object is justice. Public confidence in the criminal justice system is maintained by assuring that it operates in a fair and impartial manner." *Turbin v. Superior Court,* 165 Ariz. 195, 198, 797 P.2d 734, 737 (App.1990); *see also* A.R.S. § 11–532. In *Pool v. Superior Court,* 139 Ariz. 98, 103, 677 P.2d 261, 267 (1984), our supreme court described the prosecutorial duties in these terms:

Thus, to paraphrase the words of Justice Sutherland, the prosecutor is not the representative of an ordinary litigant; he is a representative of a government whose obligation to govern fairly is as important as its obligation to govern at all. The prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." Thus, "while he may strike hard blows, he is not at liberty to strike foul ones." It is the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction just as it is his duty to use all proper methods to

bring about a just conviction. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

With respect to public disclosures, our supreme court has adopted Rule 42, ER 3.8(e), Rules of the Supreme Court, governing a prosecutor's responsibilities:

The prosecutor in a criminal case shall:

\*    \*    \*    \*    \*    \*

(e) exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under ER 3.6.

ER 3.6, referred to in ER 3.8(e), relates to publicity. It reads:

(a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

(b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

(2) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement;

(3) The performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or

nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

(c) Notwithstanding paragraph (a) and (b)(1) through (b)(5), a lawyer involved in the investigation or litigation of a matter may state without elaboration:

(1) the general nature of the claim or defense;

(2) the information contained in a public record;

(3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense or claim or defense involved and, except when prohibited by law, the identity of the persons involved;

(4) the scheduling or result of any step in litigation;

(5) a request for assistance in obtaining evidence and information necessary thereto;

(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

(7) in a criminal case:

(i) the identity, residence, occupation and family status of the accused;

(ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;

(iii) the fact, time and place of arrest; and

(iv) the identity of investigating and arresting officers or agencies and the length of the investigation.

*See also State v. Schmid,* 109 Ariz. 349, 353–54, 509 P.2d 619, 623–24 (1973).

The Supreme Court's comment on ER 3.6 is also helpful.

### Comment

It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result could be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence. On the other hand, there are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

No body of rules can simultaneously satisfy all interests of fair trial and all those of free expression. The formula in this rule is based upon the ABA Model Code of Professional Responsibility and the ABA Standards Relating to Fair Trial and Free Press, as amended in 1978.

We have compared our ER 3.6 with Section 8–1.1, II *ABA Standards for Criminal Justice* (1980), and they are identical except in two respects which are of no concern here.[2] The Chapter 8 introduction

**2.** Chapter 8, which includes Section 8–1.1, contains the ABA Standards Relating to Fair Trial and Free Press.

notes that the standard is an attempt to apply *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) to the real world of criminal trials. It notes that Section 8–1.1 "turns on proof that the extrajudicial statement would pose a clear and present danger to the fairness of the trial." This is the same focus found in our supreme court's comment to ER 3.6. Judge Ryan also focused on the danger to a fair trial in his May 26, 1987, "Gag Order" and his June 24, 1987, clarification order. Indeed, the danger that the defendants would not receive a fair trial was paramount in Judge Ryan's consideration and was also recognized by Judge Seidel.

However, no such concern is mentioned in Judge Cates' May 31, 1988, order. Thus, it appears that Collins' argument regarding his duty to ensure a fair trial and his concern with the ethical constraints of ER 3.6 and ER 3.8 were either rejected or given little weight by Judge Cates. He found that although Collins was not acting in bad faith, he was acting in an arbitrary and capricious manner in refusing to turn the police report over to the reporters, and he awarded attorneys' fees against him for that reason. The May 31, 1988, order makes no attempt to analyze the issue on the basis of either *Mathews* or *Carlson,* but merely opines that "the failure to submit a redacted report was wrongful."

The record does not reveal a court order requiring Collins to file a redacted copy of the police investigation report with the court prior to Judge Cates' substitution as the trial judge. Indeed, Judge Cates' October 6, 1987, order is the first appearing in the record directing Collins to "provide a copy of the investigative report to plaintiffs' attorney." Nothing was said in the order about a redacted copy of the report. The order's broad language resulted in the special action that was filed in this court, in which we took jurisdiction and stayed the proceedings in the superior court. After we relinquished jurisdiction, the trial court's February 17, 1988, order is the first court order that actually directed Collins to deliver a redacted copy of the investigative report to the reporters. Collins complied with this order. Thus, the record does not support Judge Cates' conclusion that Collins' "failure to file a redacted report was wrongful."

Further, the May 31, 1988, order also found that Collins' "failure to produce a redacted record, notwithstanding the justification cited by defendant Collins, was arbitrary and capricious." In determining whether Collins acted arbitrarily and capriciously in refusing to turn over the police reports voluntarily to the reporters, "we review the record to determine whether there has been 'unreasoning action, without consideration and in disregard for facts and circumstances; where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion had been reached'." *Petras v. Arizona State Liquor Board,* 129 Ariz. 449, 452, 631 P.2d 1107, 1110 (App.1981) (quoting *Tucson Public Schools, Dist. No. 1 v. Green,* 17 Ariz.App. 91, 94, 495 P.2d 861, 864 (1972)).

Our review of this record does not support Judge Cates' conclusion that Collins acted in an arbitrary or capricious manner. His ethical duties under ER 3.6 and ER 3.8, his duty to furnish the defendant a speedy trial, his instant concern with the grand jury, the indictments, and the ongoing prosecution of the defendants demonstrate that he was attempting to perform his prosecutorial duty and at the same time comply with *Mathews* and *Carlson* regarding discovery. His May 15 and May 18, 1987, letters to the reporters state these very concerns, which were later addressed in his motion to dismiss. That these concerns were genuine is supported by the record.

The *Amici* add an additional factor to weigh in the balance; Rule 15.4(d), Arizona Rules of Criminal Procedure, limits the use of discovered materials furnished to an attorney to trial preparation and this material "shall not be disclosed to the public." The supreme court's comment following Rule 15.4(d) states, "This section merely reminds

counsel that discovery materials are to be considered confidential records provided for his limited use in conducting a particular case."

Thus, Rule 15.4(d) limits discovery to assisting a defendant in trial preparation. It is not intended to provide pretrial publicity in favor of either the prosecutor or defendant.[3] Further, our criminal discovery rules are for the purpose of providing the defendant with a fair trial. Ariz. Const. art. 2, § 24.

■■■ Reporters are entitled to report and publish events that occur in open court. *Phoenix Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 260, 418 P.2d 594, 597 (1966); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). The public has a right to attend criminal trials and preliminary hearings. *Phoenix Newspapers, Inc. v. Jennings*, 107 Ariz. 557, 559, 490 P.2d 563, 565 (1971); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Press Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). Neither reporters nor the public, however, are entitled to examine and photocopy police reports in an active ongoing criminal prosecution, because the countervailing interests of due process, confidentiality, privacy and the best interests of the state make disclosure inappropriate.

This policy was expressed as a part of our reasoning in *Church of Scientology v. City of Phoenix Police Dept.*, 122 Ariz. 338, 594 P.2d 1034 (App.1979), in which we permitted discovery of investigative reports, but in a twenty-year-old case. We said:

The appellee's principal underlying contention is that, even though no specific harm will be done by the disclosure of these particular documents, the efficient functioning of law enforcement agencies will be undermined by any disclosure of investigatory materials, no matter how stale. In support of this contention, the appellee relies upon a series of California cases, holding that various investigatory materials are not subject to disclosure. *See Runyon v. Board of Prison Terms and Paroles*, 26 Cal.App.2d 183, 79 P.2d 101 (1938) (letters to parole board); *People v. Wilkins*, 135 Cal.App.2d 371, 287 P.2d 555 (1955) (current police records); *People v. Pearson*, 111 Cal.App.2d 9, 244 P.2d 35 (1952) (sheriff records described as "public records but confidential"); *City Counsel of City of Santa Monica v. Superior Court*, 204 Cal.App.2d 68, 21 Cal.Rptr. 896 (1962) (private investigator's report concerning dismissal of police chief denied to newspaper). *All of those cases, however, apparently involved materials of a highly contemporary nature. Disclosure would have resulted in impairment of investigation or invasion of privacy.* We find nothing in those cases to indicate that investigative materials should forever remain confidential simply as a result of its original characterization as such. In fact, one California decision cited by appellee dealing with grand jury transcripts, holds that material which at one time is properly secret should not permanently be withheld from public inspection. *Craemer v. Superior Court*, 71 Cal.Rptr. 193, 265 Cal.App.2d 216 (1968).

*Id.* 122 Ariz. at 339–40, 594 P.2d at 1035–36 (emphasis added). The facts here involve an active ongoing criminal prosecution that was proceeding in a diligent manner. Thus, disclosure was not required as in *Church of Scientology*.

Additionally, Judge Ryan's May 26, 1987, "Gag Order" and his June 24, 1987, clarifi-

---

**3.** In the recent case of *State ex rel. Corbin v. Ybarra*, 161 Ariz. 188, 192, 777 P.2d 686, 690 (1989), our supreme court held that the work product exception to discovery, Rule 15.4(b), Arizona Rules of Criminal Procedure, extends to reports of experts, investigators and agents on which the attorney must rely at trial. Whether this exemption extended to police reports was

not an issue in the case. *But see State ex rel. Corbin v. Superior Court*, 99 Ariz. 382, 384, 409 P.2d 547, 549 (1966) (under old Criminal Rule 195, police officers' reports were "work product" of the prosecuting attorney when the police were to testify at trial subject to cross-examination).

cation order relied extensively on the authority of *KPNX Broadcasting Co. v. Superior Court,* 139 Ariz. 246, 678 P.2d 431 (1984). In *KPNX Broadcasting,* our supreme court relied extensively on United States Supreme Court opinions in concluding that the trial judge's order prohibiting reporters from sketching the faces of jurors during trial violated the first amendment, but that the trial judge's "Gag Order" did not violate the Constitution. The surrounding factual circumstances of the instant case, as detailed in Judge Ryan's order, are similar to *KPNX Broadcasting.* The instant case demonstrates clearly Judge Ryan's fear that a fair trial for the defendant would have been practically impossible, given the excessive pretrial publicity that had already occurred. We believe that Judge Cates should have also weighed in the balance this fact in determining whether Collins was acting in an arbitrary and capricious manner in not turning over the police investigative reports to the reporters.

Finally, we believe that under federal law the courts would reach the same result. This case does not involve a restriction on reporters' rights to attend criminal proceedings or speak or write on matters disclosed in open court; no free speech right is implicated. This case involves only reporters' claims to access investigative information in an active ongoing criminal prosecution. No such right exists under the Arizona Constitution, the Arizona Public Records Act, the United States Constitution or the Freedom of Information Act. *See* United States Supreme Court opinions *cited in KPNX Broadcasting* and the recent case of *United States Dept. of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989); *see also Mountain States Telephone & Telegraph Co. v. Arizona Corporation Commission,* 160 Ariz. 350, 773 P.2d 455 (1989) and cases cited therein.

## CONCLUSION

In our opinion, the trial judge abused his discretion in awarding the reporters costs and attorneys' fees against Collins. The judgment of the trial court is therefore reversed.

SHELLEY and VOSS, JJ., concur.